ALTON DANIEL WATSON, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
Watson v. Commissioner
Docket No. 27915-85.
United States Tax Court
T.C. Memo 1988-29; 1988 Tax Ct. Memo LEXIS 29; 54 T.C.M. (CCH) 1601; T.C.M. (RIA) 88029; January 27, 1988. *29 1. Petitioner's fur trading activity was a business, not a hobby. 2. Furs sent by petitioner to Seattle Fur Exchange for sale on consignment were includible in petitioner's inventory. 3. Petitioner failed to prove error in respondent's determination of value of the inventories. 4. Petitioner failed to prove that he was entitled to deduct business expenses in excess of those allowed by respondent. 5. Deficiencies in petitioner's tax liability for the years 1978 and 1979 were due to fraud. Alton Daniel Watson, pro se. Wesley F. McNamara, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION *30 DRENNEN, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Income Tax
Additions to Tax
Year
Deficiency
Sec. 6653(b) [1]
1978
$ 8,379
$ 4,190
1979
6,129
4,541
The issues for decision are: (1) whether furs consigned by petitioner to the Seattle Fur Exchange for sale were inventory of petitioner, and the amount of petitioner's inventory, if any, at year-end for 1978 and 1979; (2) whether *31 petitioner is entitled to deductions in connection with his fur trading activity in excess of those allowed by respondent for 1978 and 1979; and (3) whether petitioner is liable for the additions to tax for fraud under section 6653(b) for the years in issue. Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. FINDINGS OF FACT Petitioner (sometimes hereinafter referred to as "Alton"), resided in Glendale, Oregon at the time he filed his petition in this case. Petitioner and his then current wife, Joann Watson Baas (hereinafter referred to as Joann), timely filed a joint 1978 Federal income tax return. Petitioner filed a separate individual Federal income tax return for 1979 on April 23, 1980. Petitioner did not request or receive an extension of time for filing said return. [2]
Petitioner and Joann were married in 1963 and lived together until they were divorced in September of 1980. They had four children, all of whom lived at home during the years at issue. Petitioner worked *32 full time as a "hot press" operator at a plywood plant during the years at issue. He received wages of $ 18,554.54 for 1978 and $ 18,541.38 for 1979 from this job. He also received $ 400 in wages from the Douglas County School District #77 in 1979. Joann received wages of $ 5,997.43 from Douglas County School District #77 in 1978. Petitioner was also engaged in fur trading activities during each of the years 1975 through 1980. During 1978 and 1979 petitioner purchased furs at warehouse sales, at times paying $ 30,000 or more for the furs. He also purchased furs from various individuals. Some of the furs he bought were dried and cleaned; others he had to have dried and cleaned. From time to time he sent these furs to the Seattle Fur Exchange, Inc. (hereinafter referred to as the "Exchange") where they were held on consignment and eventually sold for his account. The Exchange sometimes advanced petitioner funds against the sale of his furs. The Exchange kept a running account of petitioner's consignments and sales therefrom. When the Exchange sold petitioner's furs it reduced the sales proceeds payable to petitioner by the amount of any charges against the account and of any *33 outstanding advances and paid the balance to petitioner. Pursuant to an "Advance Receipt" agreement, the Exchange maintained a "first lien" on petitioner's furs until such time as the advances were repaid in full. The season for marketing furs was from late Fall until Spring. In 1978, the Exchange credited petitioner's account for sale proceeds of his furs on the dates and in the amounts reflected below: Date
Amount
January 5, 1978
$  5,725.34
January 30, 1978
45.12
February 14, 1978
23,825.79
May 3, 1978
34,065.64
Total:
$ 63,661.89
The balance in petitioner's account after the May 3, 1978 payment was zero. In 1979, the Exchange credited petitioner's account for sale proceeds of his furs on the dates and in the amounts reflected below: Date
Amount
January 8, 1979
$  22,520.96
February 27, 1979
61,673.02
March 28, 1979
133.90
April 23, 1979
135.36
May 2, 1979
31,300.39
Total:
$ 115,763.63
The balance in petitioner's account after the May 2, 1979 payment was zero. On January 1, 1978, petitioner owned no furs in connection with his fur trading activities. On December 31, 1978, and *34 on January 1, 1979, the Exchange held furs for sale on petitioner's account, the cost of which to petitioner was $ 18,647. On December 31, 1979, the Seattle Fur Exchange held furs for sale on petitioner's account, the cost of which to petitioner was $ 38,382. [3] Petitioner's gross receipts from the sale of furs for 1978 and 1979 were $ 63,215 and $ 114,739, respectively. [4]
Neither income nor expenses related to petitioner's fur trading activity were reported on petitioner's income tax returns for 1978 and 1979. The returns in no way reveal petitioner's fur trading activities. Petitioner was *35 aware that said activities were not reflected on his 1978 and 1979 returns at the time he filed each of said returns. Petitioner's 1978 and 1979 returns were prepared by Mrs. Proctor, a tax consultant licensed by the State of Oregon, but petitioner did not mention his fur trading activities to her. During the audit of petitioner's fur trading activities, petitioner claimed total fur purchases of $ 65,456 for 1978 of which respondent allowed a total of $ 59,284. Of this amount, $ 56,412 was represented by cancelled checks; the remaining $ 2,872 were claimed to be cash expenditures made by petitioner for the purchase of furs. Petitioner did not provide an itemized statement detailing these cash expenditures; however, respondent allowed all of petitioner's claimed cash expenditures for furs for the year 1978. Petitioner claimed a total of $ 120,392 for 1979 fur purchases, all of which was evidenced by cancelled checks. Respondent allowed this entire amount, even though a total of $ 4,600 worth of checks were made payable to cash. Petitioners did not report any income or expenses from petitioner's trading activities on their 1978 return. Petitioner did not offer respondent's *36 agent any evidence of his expenses incurred in his fur trading activity for 1978, nor did he offer any proof of those expenses during the trial. Also, during the audit, petitioner presented to respondent's agent a paper on which he claimed the following additional expenses allegedly associated with his fur trading activities for the year 1979: [5]
1) Loan from Woodrow Watson (petitioner's father)
$  8,000
2) Loan from Evelyn Watson (petitioner's sister)
7,000
3) "My own Loan"
13,600
4) "Dogs (16 hounds)"
"food estimate"
3,840
purchase two dogs
1,500
2,000
5)  Labor-fur drying' Woodrow Watson
1,750
5) (sic) Labor - "my four boys." Drying Furs
4 x $ 399/ea
1,596
6)  "Labor to ex wife Joann"
"bound"
5,000
"down of 1979 Dodge wagon"
3,600
7)  House expenses
11 cords wood/$ 65 ea
715
Electricity 12 x $ 55 avg.
660
Property taxes
370
Fire insurance
275
8)  "Part of house used for business
2 bedrooms total use dining room
2/3 use for buying, phone & drying
-0-
9)  Drying shed
4 cords wood/$ 65 ea
260
10) "Traps lost"
39 Newhouse traps $ 271/ea
1,053
*37 Petitioner provided no documentation or other substantiation of these additional expenses during the course of the audit or appellate process. Joann reluctantly filed a joint return for 1978 with Alton because he refused to report his fur trading activities on the return. She refused to sign a joint return for 1979 for the same reason although she and Alton were married throughout the year. On their joint return for 1978, petitioners reported as income only a lump-sum figure combining the wages of Alton and Joann. They claimed no deductions and computed their tax from the tax tables. On his individual return for 1979 petitioner reported as income his wages and $ 546 of interest from a bank; he claimed no deductions and computed his tax from the tax tables. In the notice of deficiency for 1978, respondent made an adjustment to petitioner's income of $ 63,217 for gross receipts from the fur wholesaling activity and allowed a deduction of $ 59,284 for purchases, *38 but reduced this figure by $ 18,647 - for ending inventory. The net of these adjustments were added to the income reported on the return to arrive at taxable income totalling $ 47,132. In the notice of deficiency for 1979, respondent made an adjustment of $ 114,739 for gross receipts from the fur wholesaling activity, allowing an opening inventory of $ 18,647 and deducted an ending inventory of $ 38,392, allowed a deduction of $ 120,392 for fur purchase expenses and of $ 782 for home office expense, to arrive at net adjustments of $ 13,310, which, when added to taxable income reported on the return, resulted in taxable income of $ 32,797. OPINION Petitioner explains his failure to mention his fur trading activities or to report any income or expenses thereof on his returns for 1978 and 1979 because the activity was a hobby and any income therefrom was nontaxable. He cites no authority for this position except he pointed to a magazine article published in 1986 which suggested that the Internal Revenue Service requires that a taxpayer show a profit on farming for two out of five consecutive years to qualify for tax losses. His reference to the article is clearly irrelevant *39 and does not support his position. Section 61 defines gross income as meaning "all income from whatever source derived," unless excluded by law. It includes gains realized from a single isolated sale of property, as well as profits realized from sales by one engaged in buying and selling as a business. Merchants' Loan and Trust Co. v. Smietanka,255 U.S. 569 (1921). On the other hand, deductions are a matter of legislative grace and the burden is on petitioner to prove that an expenditure is allowable. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934). We know of no provision in the law which allows a deduction for losses incurred in a hobby, as distinguished from a business, while gains derived from a hobby are clearly taxable income. Thus petitioner has failed to prove that his income from the fur business was not taxable even if it was a hobby. Furthermore, petitioner has offered no evidence except his own bold statement that his fur trading activities were a hobby. Petitioner did very little hunting and trapping himself during the years in *40 issue; he bought the furs, sometimes paying thousands of dollars at fur sales, and sold them on consignment through the Exchange. In 1978 the Exchange paid him or gave him credit for $ 63,661 from the sale of his furs and in 1979 paid him $ 115,763 from the sale of his furs. Petitioner kept records of whom he bought furs from and what he paid for them. He bought furs from as many as 11-12 trappers a day at times. The fact that his records were not always accurate does not change his business activity into a hobby. Based on all the evidence we conclude that petitioner was in the fur trading business to make a profit during the years in issue. This finds support in a newspaper article, dated January 3, 1980, submitted as an exhibit, which depicted Watson as having been in the fur wholesale business for five years. Our next question is whether furs consigned by petitioner to the Exchange were inventory to petitioner which he had to take into account in determining his income derived from the fur trading activity. Respondent determined that the furs held on consignment by the Exchange were inventory of petitioner and must be included in determining gross receipts for petitioner's *41 fur trading activities during 1978 and 1979. Petitioner does not deny that the Exchange held furs on his account during 1978 and 1979, but instead argues that he had no inventory during the years in issue because "said furs were in (a) state of transit and no longer in petitioner's control." Section 471 states the general rule for accounting for inventories as follows: Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as mostly clearly reflecting the income.
Regulation section 1.471-1, Income Tax Regs., states in relevant part the following: In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, *42 or sale of merchandise is an income-producing factor. * * * Merchandise should be included in the inventory only if title thereto is vested in the taxpayer. Accordingly, the seller should include in his inventory goods under contract for sale but not yet segregated and applied to the contract and goods out upon consignment, but should exclude from inventory goods sold (including containers) title to which have passed to the purchaser. A purchaser should include in inventory merchandise purchased (including containers), title to which has passed to him, although such merchandise is in transit or for other reasons has not been reduced to physical possession, but should not include goods ordered for future delivery, transfer of title to which has not yet been effected. [Emphasis added.] The determination of whether goods bought or sold by a taxpayer are to be included in the taxpayer's inventory turns on whether title to the goods is vested in the taxpayer at the time the inventory is taken. Pursuant to the above quoted regulation, goods of the seller on consignment to a third *43 party are to be included in the seller's inventory if the seller retains title to the goods even though said goods are in transit or for some other reason the seller does not maintain "physical possession" of the goods. See also Fishell v. Commissioner,14 B.T.A. 87 (1928). Accordingly, furs held by the Exchange for petitioner were includable in petitioner's inventory unless petitioner no longer retained title to the furs at the time the inventory was valued. The only document which petitioner has produced to evidence the contractual relationship between petitioner and the Exchange is the Advance Receipt. The Advance Receipt contains nothing to suggest that title to the goods had passed to the Exchange. To the contrary, therein the Exchange is granted a "first lien" on petitioner's furs in the event petitioner fails to repay the advances made by the Exchange against the eventual sale of petitioner's furs. The Exchange would have no need to impose a lien against the furs if title had already passed to the Exchange. The language contained in the advance Receipt suggests that petitioner retained title to the furs until sold by the Exchange to third parties. Absent *44 evidence to the contrary, we conclude petitioner retained title to the furs transferred to the Exchange on consignment. Petitioner also argues that the furs held by the Exchange are not includible as inventory because his fur trading activities were nothing more than a hobby. Presumably, petitioner is arguing goods not intended for sale should be excluded from inventory. [6]
As stated previously, petitioner has failed to establish that his fur trading activity was a hobby or that the furs he consigned to the Exchange were not intended for sale. Petitioner claimed to have experienced losses in every year of his fur trading activities, from 1975 through 1985, and that he borrowed substantial sums from various relatives whom he could not pay back. He also testified how badly he felt about not being able to repay the loans. Such testimony makes it difficult to believe that petitioner would engage in a hobby for ten years which instead of bringing personal satisfaction brought feelings of remorse and guilt. We find that the furs consigned by petitioner to the Exchange during *45 1978 and 1979 were intended for sale as an income producing activity and until sold constituted inventory of the petitioner within the meaning of section 471. Next we must determine the value of petitioner's inventory to be included in reconstructing petitioner's gross income. Respondent valued petitioner's inventory held by the Exchange on January 1, 1978 as zero; the value on December 31, 1978 as $ 18,647; the value on January 1, 1979 as $ 18,647; and the value on December 31, 1979 as $ 38,392. In petitioner's response to respondent's answer wherein said figures are set forth, petitioner stated only that he "admits except denies, said furs were in (a) state of transit and no longer in petitioner's control." [7] Petitioner presented no evidence or testimony to contradict the value of his furs held by the Exchange on the above mentioned dates. Absent evidence to the contrary, we find that the value of petitioner's inventory for purposes of computing his gross income derived from his fur trading activities is as set forth by respondent in his statutory notice of deficiency. *46 We must next determine if petitioner is entitled to deduct additional expenses allegedly incurred in petitioner's fur trading activities. Petitioner provided no substantiation of these additional expenses either during the course of respondent's audit, the administrative appeal process or at trial and briefing of this case. [8] In an attempt to explain this lack of substantiation, petitioner claims that after their divorce, Joann unlawfully entered petitioner's home and burned all of petitioner's records relative to his fur trading activities. Petitioner testified that he was not present during the alleged destruction, but returned home one day to find a pile of ashes on his kitchen floor. Petitioner's current wife testified that petitioner told her that Joann had burned his records, but she could not testify that she had actually seen Joann destroy the documents. Petitioner presented no reconstruction of the destroyed records other than his own testimony and a handwritten list produced by petitioner which has been incorporated in our findings of fact. *47 In general, when a taxpayer's records have been lost or destroyed through circumstances beyond the taxpayer's control, he is entitled to substantiate a deduction by reconstruction of his expenditures through other credible evidence. [9] Although not required to do so, we may accept credible testimony of a taxpayer to substantiate deductions when no further documentation is available. However, petitioner's testimony relative to the additional deductions was controverted in every respect by Joann who was called as respondent's witness. She testified that each additional expense claimed by petitioner was either a total fabrication or grossly overstated. Joann further testified as to petitioner's intentional non-reporting of his fur trading income and his attempt to falsify deductions. Joann so testified despite the fact that she is jointly liable for any deficiency assessed against petitioner for the taxable year 1978. [10] Joann testified that she had not been offered immunity from respondent nor had she received any indication that she would not be held responsible for all or part of the underpayment of petitioner's tax. While Joann's testimony may not be totally without self-interest *48 [11] we found her testimony generally open and candid, and in light of the risk of personal liability, credible. *49 Given the lack of credible substantiating evidence, we cannot allow petitioner credit for additional fur trading expenses beyond those already allowed by respondent. The final issue for decision is whether petitioner is liable for the addition to tax for fraud under section 6653(b). For purposes of section 6653(b), fraud is an intentional wrongdoing with a specific intent to evade a tax believed to be owed. Stoltzfus v. United States,398 F.2d 1002, 1004 (3rd Cir. 1968), cert. denied 393 U.S. 1020 (1969); McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.d 1121 (5th Cir. 1975). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Estate of Pittard v. Commissioner,69 T.C. 391 (1977); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. in an unpublished opinion 578 F.2d 1383 (8th Cir. 1978). The burden of proof is on respondent to prove fraud by clear and convincing evidence. Section 7454(a); Rule 142(b). Fraud is not to *50 be imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner,53 T.C. 96, 112 (1969). However, direct proof of fraudulent intent is seldom available, and respondent may show requisite intent from the conduct of the taxpayer and the surrounding circumstances. Grosshandler v. Commissioner,75 T.C. 1, 19 (1980); Stone v. Commissioner,56 T.C. 213, 223-224 (1971). After carefully considering the evidence, we conclude that respondent has proved by clear and convincing evidence that petitioner's returns for 1978 and 1979 were false or fraudulent with the intent to evade tax. Joann's testimony gives us some indication of petitioner's frame of mind at the time he filed his returns. She testified that petitioner decided at the inception of his fur trading activities in 1975 not to report the income derived therefrom. At first she acquiesced in petitioner's scheme and signed the returns, but later she refused to sign the returns until petitioner promised to report the income from his fur trading activities on the subsequent year's return. It was not until 1978 that Joann, after *51 signing that year's return, became convinced that petitioner was lying to her and that he had no intention of ever reporting his fur trading income. Joann further testified: I had asked him before, I said "What are you going to do if they catch up with you on this" and he said "All I have to do is stick to one answer and lie about it, and they can't prove nothing on me." He said, "If you don't admit to guilt, you are not proven guilty." We do not rely solely on Joann's testimony as evidence of petitioner's fraudulent intent to evade taxes. Petitioner testified that he asked Mrs. Proctor, his tax return preparer, whether he needed to report hobby income and that she replied "no." Mrs. Proctor took the stand and directly contradicted petitioner's testimony. She stated that at no time had petitioner discussed any fur trading activities or any other income producing hobby, and that had she been aware of such a hobby she would have included income derived from the activity on petitioner's returns. It is undisputed that petitioner failed to report gross receipts derived from his fur trading activities of $ 63,215 in 1978 and $ 114,739 in 1979. [12] A taxpayer's repeated failure *52 to report substantial amounts of income is effective evidence of fraudulent intent. See Vannaman v. Commissioner,54 T.C. 1011 (1970); Rogers v. Commissioner,111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938). The record does not supply us any information as to petitioner's formal or informal education; however, petitioner himself demonstrated that he was aware of his obligation to report and pay tax on income he earned. [13] Furthermore, we believe that petitioner was generally involved in activities which encouraged, or at least permitted, others to conceal taxable income. [14]
*53 In light of petitioner's successive failure to report substantial amounts of income, the direct evidence of petitioner's fraudulent intent supplied by the testimony of Joann and petitioner's tax return preparer and because of petitioner's own incriminating testimony, we find that respondent has proved by clear and convincing evidence that petitioner's returns for 1978 and 1979 were false or fraudulent with intent to evade tax. Accordingly, petitioner is liable for additions to tax for fraud under section 6653(b) as set forth in respondent's notice of deficiency. To reflect the foregoing Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Any addition to tax for fraud is increased considerably by the failure to file a timely return. ↩
3. In his reply to respondent's Answer, petitioner conceded the cost of the furst held by the Exchange, but stated "said furs wrer (sic) in state of transit and no longer in petitioner's control." ↩
4. Petitioner's gross receipts, as stipulated by the parties, is in variance with the sale proceeds credited to petitioner's account with the Exchange, also stipulated by the parties. No explanation for the discrepancy is given. We resolve the issue in petitioner's favor and find that petitioner's gross receipts from fur sales in 1978 and 1979 were $ 63,215 and $ 114,739, respectively. ↩
5. This statement was not given to the revenue agent during his first audit; it was submitted after petitioner became aware that the agent was using a bank deposits method in computing petitioner's income. ↩
6. Petitioner does not state any other relevance of his hobby argument, and we can find no other. ↩
7. Petitioner's response appears on its face to have conceded the value of the furs held by the Exchange on the above dates. Petitioner appears to deny only that the first should be included in his inventory because the "furs were in (a) state of transit and no longer in petitioner's control." Again we resolve this issue in petitioner's favor and conclude that he has not conceded, by his response to respondent's answer, the value of the inventory held by the Exchange. Petitioner was therefore entitled to present evidence to disprove respondent's determination of value. ↩
8. Petitioner elected not to file a brief. ↩
9. For example under section 274(d) and section 1.274-5(c), Income Tax Regs., the taxpayer is not entitled to deductions for travel expenses unless they are properly substantiated. Section 1.274-5(c)(5), Income Tax Regs., provides "[where] the taxpayer establishes that the failure to produce adequate records is due to the loss of such records through circumstances beyond the taxpayer's control, such as destruction by fire, flood, earthquake, or other casualty, the taxpayer shall have a right to substantiate a deduction by reasonable reconstruction of his expenditures." Compare Gizzi v. Commissioner,65 T.C. 342 (1975), and Canfield v. Commissioner,T.C. Memo. 1980-533, 41 T.C.M. 461↩, 49 P-H Memo T.C. par. 80,533. 10. Petitioner and Joann filed jointly for 1978 and Joann signed the return knowing that it failed to report petitioner's fur trading activities. ↩
11. Petitioner and Joann openly and repeatedly expressed hostility towards each other at trial. After her divorce from petitioner, Joann ultimately married the ex-husband of petitioner's current wife. Petitioner believes that Joann brought petitioner's fur trading activities to the attention of respondent in order to hurt him. Petitioner further testified that there are now or have been numberous civil suits between him and Joann which have resulted in a very combative relationship. We need not concern ourselves with the details of petitioner's relationship with Joann except as it may supply a motive to her testimony. ↩
12. However, petitioner did report his fur trading activities on his 1980 return; he claimed a loss from the activity. ↩
13. For example, petitioner testified that he paid each of his sons $ 399 to help him in his fur trading activities, despite the fact that there was considerable discrepancy in their ages. He further testified that the payment to each boy "was $ 399 and no more" because if he had paid them more than $ 400 they would have been liable for self-employment tax. ↩
14. Petitioner openly testified that he purchased furs for cash, not checks because cash payments "help these people to conceal their income." Concerning his attempt to help others to conceal income, petitioner rather astonishingly testified, "I've done humanity a big effort as far as I'm concerned." ↩