T.C. Memo. 2001-198

UNITED STATES TAX COURT

ROBERT L. BECK, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MARGUERITE BECK, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 14577-98, 14578-98.        Filed July 30, 2001.

Robert L. Beck and Marguerite Beck, pro sese.

Nancy Graml, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge:  These cases were consolidated for trial, briefing, and opinion.  By separate notices of deficiency, respondent determined the following deficiencies, additions to

tax, and penalties with respect to each petitioner's Federal

income taxes:[1]

### Robert L. Beck

| Year | Deficiency | Additions to Tax Sec. 6651(a)(1) | Penalties [1]Sec. 6663(a) |
|------|-----------|----------------------------------|----------------------------|
| 1991 | $50,232 | $12,558 | $37,674 |
| 1992 | 50,051 | 12,513 | 37,538 |
| 1993 | 58,916 | 14,729 | 44,187 |
| 1994 | 83,789 | 20,947 | 62,842 |
| 1995 | 79,636 | 23,049 | 59,727 |

[1] The notice of deficiency states that if "it is determined the underpayment is not due to fraud, then the accuracy related penalty per Internal Revenue Code Section 6662(a) would be applicable."

### Marguerite Beck

| Year | Deficiency | Additions to Tax [1]Sec. 6651(f) | Sec. 6654(a) |
|------|-----------|----------------------------------|--------------|
| 1991 | $43,671 | $32,753 | $2,496 |
| 1992 | 41,045 | 30,784 | 1,790 |
| 1993 | 50,049 | 37,537 | 2,097 |
| 1994 | 68,890 | 51,667 | 3,575 |
| 1995 | 76,387 | 57,290 | 4,142 |

[1] The notice of deficiency states that if "it is determined the failure to file is not due to fraud, then the delinquency penalty rate of 25 percent, per Internal Revenue Code Section 6651(a) would be applicable."

In his answer to Robert L. Beck's (Dr. Beck's) petition, respondent conceded the fraud penalties under section 6663(a) for

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

all years in issue, and asserted in the alternative accuracy-related penalties under section 6662(a), as follows:

| Year | Penalties Sec. 6662(a) |
|------|------------------------|
| 1991 | $10,046 |
| 1992 | 10,010 |
| 1993 | 11,783 |
| 1994 | 16,758 |
| 1995 | 15,927 |

In his answer to Marguerite Beck's (Mrs. Beck's) amended petition, respondent conceded the additions to tax under section 6651(f) for fraudulent failure to file and asserted in the alternative additions to tax for failure to file pursuant to section 6651(a)(1) as follows:

| Year | Additions to Tax Sec. 6651(a)(1) |
|------|----------------------------------|
| 1991 | $10,918 |
| 1992 | 10,261 |
| 1993 | 12,512 |
| 1994 | 17,223 |
| 1995 | 19,097 |

After concessions, the issues to be decided are: (1) Whether Dr. Beck is entitled to dental-practice business deductions greater than respondent has allowed; (2) whether for years 1993, 1994, and 1995, Dr. Beck is entitled to claimed losses allegedly arising from a horse operation; (3) whether Dr. Beck is entitled to claimed net operating loss carryovers; (4) whether Dr. Beck's income from his dental practice and from oil royalties constitutes community property, taxable one-half to each petitioner for each year in issue; (5) whether Mrs. Beck

qualifies for relief pursuant to section 66(c); (6) whether petitioners are liable for additions to tax pursuant to section 6651(a)(1) for failure to file timely returns; (7) whether Dr. Beck is liable for accuracy-related penalties pursuant to section 6662(a); and (8) whether Mrs. Beck is liable for additions to tax pursuant to section 6654(a) for underpayment of estimated taxes.[2]

Procedural Background

On August 28, 1998, petitioners filed their petitions with this Court. They were then represented by John Wells (Wells). By Court Order dated January 14, 1999, the cases were calendared for trial at the session of the Court commencing May 17, 1999, at Houston, Texas.

On February 1, 1999, Wells filed a motion to withdraw as counsel. On February 3, 1999, the Court granted Wells's motion.

After unsuccessfully attempting to secure petitioners' cooperation in preparing a stipulation of facts, on February 19, 1999, respondent sent a letter to each petitioner, requesting them to respond in writing to his proposed stipulations of facts and evidence contained in 110 separately numbered paragraphs. On the same date, respondent mailed to each petitioner and filed

---

[2] Robert L. Beck's (Dr. Beck's) self-employment tax, self-employment tax deduction, and the amounts of his allowable personal exemption and standard deduction are computational. Similarly, the amounts of Marguerite Beck's (Mrs. Beck's) allowable personal exemption and standard deduction are computational.

with the Court, pursuant to Rule 90, respondent's request for admissions, reflecting substantially the same matters contained in respondent's proposed stipulations of fact.

On April 2, 1999, Lorenzo W. Tijerina (Tijerina) filed an entry of appearance on behalf of Dr. Beck. Also on April 2, 1999, Dr. Beck filed a motion to continue the trial, on the ground that Tijerina needed additional time to familiarize himself with the case and consult with Dr. Beck and respondent's trial attorney.

On April 5, 1999, respondent filed a motion for an order to show cause why his proposed stipulations should not be deemed accepted pursuant to Rule 91(f).

On April 7, 1999, the Court entered two Orders: (1) Extending the time to April 28, 1999, for petitioners to file their responses to respondent's requests for admissions; and (2) ordering petitioners to show cause on or before April 28, 1999, why the facts and evidence set forth in respondent's proposed stipulations should not be accepted as established for purposes of these cases.

On April 29, 1999, Dr. Beck filed substantially identical responses to both respondent's request for admissions and the Court's Order to Show Cause Under Rule 91(f). In his responses, Dr. Beck refused to admit or stipulate anything except a few of the most basic facts, often stating simply "Not Admitted" or

"Not Stipulated", providing no reasons upon which he based his refusal to admit or stipulate, contrary to the requirements of Rules 90(c) and 91(f)(2). Mrs. Beck filed no response to respondent's request for admissions or to the Court's Order to Show Cause pursuant to Rule 91(f).[3]

On May 4, 1999, the Court granted Dr. Beck's motion for a continuance and discharged its Order to Show Cause Under Rule 91(f). In the Court's notice setting case for trial, dated May 21, 1999, the cases were calendared for trial at the session of the Court commencing October 25, 1999, in Houston, Texas.

On June 4, 1999, respondent once again filed a motion to show cause why proposed facts in evidence should not be accepted pursuant to Rule 91(f). The subject matter of respondent's Rule 91(f) motion was the facts and evidence set forth in those paragraphs of respondent's requested admissions and proposed stipulations of facts to which Dr. Beck had failed to agree in his previous responses. On June 7, 1999, the Court granted respondent's motion and ordered petitioners to file a response and show cause, on or before June 28, 1999 (subsequently, enlarged to July 13, 1999, by Court Order dated June 30, 1999), why the matters set forth in respondent's motion papers should not be deemed admitted for purposes of these proceedings.

---

[3] Consequently, pursuant to Rule 90(c), each matter set forth in respondent's requested admissions was deemed admitted as to Mrs. Beck.

Petitioners filed no responses to the Court's order.[4]  On July 29, 1999, the Court ordered that its June 7, 1999, Order to Show Cause be made absolute.

Consequently, all matters contained in respondent's 110 paragraphs of requested admissions and proposed stipulations were deemed admitted and/or stipulated by Mrs. Beck and either actually admitted or stipulated or deemed stipulated by Dr. Beck.

On October 20, 1999, Tijerina filed a motion to withdraw as counsel.  The Court granted Tijerina's motion.

At trial, petitioners appeared pro sese.  Dr. Beck stated that he had no objection to the admission into evidence of the various documents that were the subject of respondent's requested admissions and proposed stipulations.

## FINDINGS OF FACT

The admitted facts, deemed stipulations, and corresponding exhibits are incorporated herein by this reference.

When petitioners filed their respective petitions, they each resided in San Antonio, Texas.  Petitioners were married during the years in issue, and continued to be married, though separated

---

[4] The Court's June 7, 1999, Order to Show Cause, sent by certified mail to each petitioner, was returned unclaimed by Mrs. Beck.  The Court's June 30, 1999, Order, which enlarged the time for petitioners to respond to the June 7, 1999, Order to Show Cause, also sent by certified mail to each petitioner, was not returned unclaimed by either petitioner.

and in the process of obtaining a divorce, at the time of trial. Throughout the years in issue, petitioners resided together in the State of Texas.

Dr. Beck attended the University of Virginia, Duke University, and Harvard University. He has degrees in medicine and dentistry. During the years in issue, he was a self-employed dentist in San Antonio, Texas.

In 1987, the Texas State Board of Dental Examiners (the board), created by the Texas legislature, revoked Dr. Beck's dental license. In 1988, Dr. Beck filed suit in Texas State court to set aside the revocation. On April 1, 1992, the board and Dr. Beck entered into an agreed board order pursuant to which Dr. Beck's license was suspended for 3 years with all but the first 90 days being a probationary period. The lawsuit brought by Dr. Beck against the board was dismissed as moot.

During this process, Mrs. Beck was active in efforts on her husband's behalf to dissolve the board. She first contacted Texas Attorney General Jim Maddox, and in 1989 she contacted Texas Attorney General Richard "Racehorse" Haynes. She eventually persuaded a former board investigator to testify as a witness for Dr. Beck at the hearings before the Texas State legislature regarding dissolution of the board.[5]

---

[5] The board was dissolved in 1994 and reestablished during the 1995 Texas legislative session.

During the years in issue, Mrs. Beck occasionally worked in Dr. Beck's dental office and participated in recruiting employees for his dental practice (the dental practice). A few times each week, Mrs. Beck called the dental practice to ask the practice administrator how much money the office received for the day.

Mrs. Beck was a signatory on the dental practice's bank account at Nation's Bank (the dental practice account). From December 1993 to January 1995, petitioners maintained a joint personal account at Frost National Bank (the joint account). In addition, from November 1994 through January 1996, Mrs. Beck was the sole signatory to an account at Frost National Bank (the separate account).

Dr. Beck employed a practice administrator who handled his dental office affairs. The practice administrator would fill out checks to pay substantially all of the dental practice expenses. Either Dr. Beck or Mrs. Beck would sign the checks.

Dr. Beck accepted payment for his dental work in cash as well as checks. The dental practice offered its services at a discount if the patient paid cash. The dental practice employees turned over to Dr. Beck all cash payments received.

During 1993 and 1994, the dental practice would receive from its patients, on average, $3,000 a day in cash. From 1991 through 1994, only one cash deposit, in the amount of $2,000, was made to the dental practice account.

In 1994, Mrs. Beck deposited approximately $11,691 into her separate account, mostly in cash. In 1995, she made deposits of approximately $54,616 into the separate account, mostly in cash. The primary source of these deposits was income from the dental practice. In 1994, Mrs. Beck made cash deposits totaling at least $6,120 to petitioners' joint account.

From 1977 through September 1995, Dr. Beck, either singly or with his former wife, E. Roman Beck, owned or controlled the ownership of more than 100 acres in Blanco Hills County Estate in Bexar County, north of San Antonio, Texas (the Blanco property). In a foreclosure sale on October 3, 1995, the Blanco property was sold to an unrelated third party for $290,000. On October 15, 1995, Mrs. Beck purchased the Blanco property from the third party, in exchange for a note in the principal amount of $331,845, executed by Mrs. Beck and secured by a lien on the Blanco property. Mrs. Beck used income from Dr. Beck's dental practice to purchase the Blanco property.

Petitioners' Tax Returns

Dr. Beck filed no Federal income tax returns for taxable years 1991 through 1994 until September 1, 1995.[6] For each year

---

[6] Dr. Beck was granted extensions to file Federal income tax returns for each of the taxable years in issue and filed his returns on the dates indicated below:

(continued...)

in issue, Dr. Beck claimed a filing status of married, filing separate. Mrs. Beck filed no Federal income tax returns and paid no estimated income taxes for any of the years in issue.

For the years in issue, Dr. Beck reported on Schedule C, Profit or Loss From Business (Sole Proprietorship), income and expenses from "Dental Medical Services" as follows:

| Year | Gross Income | Total Expenses | Net Profit (or Loss) |
|------|--------------|----------------|----------------------|
| 1991 | $388,429 | $373,590 | $14,839 |
| 1992 | 551,770 | 579,198 | (27,428) |
| 1993 | 592,960 | 529,114 | 63,846 |
| 1994 | 645,960 | 585,831 | 60,129 |
| 1995 | 562,892 | 377,218 | 185,674 |

For each year in issue, Dr. Beck reported on Schedule E, Supplemental Income and Loss, $1,020 net income from oil royalties.

For taxable years 1993, 1994, and 1995, Dr. Beck reported losses on Schedule F, Profit or Loss From Farming, of $98,850, $76,700, and $9,854, respectively, relating to an alleged horse operation. For 1993 and 1994, these reported losses include claimed losses of $30,000 and $25,000, respectively, described on each Schedule F simply as "ONE DEAD HORSE".

---

[6](...continued)

| Taxable Year | Date due | Date due with Extensions granted | Date filed |
|------|----------|----------------------------------|------------|
| 1991 | Apr. 15, 1992 | Aug. 15, 1992 | Sept. 1, 1995 |
| 1992 | Apr. 15, 1993 | Aug. 15, 1993 | Sept. 1, 1995 |
| 1993 | Apr. 15, 1994 | Aug. 15, 1994 | Sept. 1, 1995 |
| 1994 | Apr. 15, 1995 | Aug. 15, 1995 | Sept. 1, 1995 |
| 1995 | Apr. 15, 1996 | Oct. 15, 1996 | Oct. 16, 1996 |

For each year in issue, Dr. Beck claimed net operating loss (NOL) carryovers as follows:

| Year | NOL Carryover |
|------|---------------|
| 1991 | $367,251 |
| 1992 | 318,145 |
| 1993 | 377,950 |
| 1994 | 408,759 |
| 1995 | 424,310 |

## Notices of Deficiency

In the notice of deficiency issued to Dr. Beck, respondent determined that Dr. Beck had claimed and failed to substantiate certain Schedule C deductions as follows:

| Year | Claimed Deductible Expenses | Respondent's Determination of Deductible Expenses | Adjustment to Taxable Income |
|------|------|------|------|
| 1991 | $382,205 | $88,407 | $293,798 |
| 1992 | 591,436 | 270,839 | 320,597 |
| 1993 | [1]542,044 | 288,668 | 253,376 |
| 1994 | [1]600,159 | 247,194 | 352,965 |
| 1995 | 377,218 | 110,174 | 267,044 |

[1] As previously indicated, for years 1993 and 1994, petitioner's claimed Schedule C deductions were $529,114 and $585,831, respectively. In the notice of deficiency, respondent appears to have overstated the amounts of deductions claimed by Dr. Beck for 1993 and 1994, resulting in excessive adjustments to taxable income for these 2 years. We expect these errors to be corrected in the Rule 155 computation.

Based on these adjustments, respondent redetermined Dr. Beck's Schedule C income for each year in issue and allocated one-half of that income, along with one-half of Schedule E royalty income reported by Dr. Beck for each year in issue, to Mrs. Beck as her community property income. Accordingly, in separate notices of deficiency, respondent determined that Mrs.

Beck had unreported income and that Dr. Beck is entitled to a corresponding deduction for the community property split of his income, as follows:

| Year | Amount |
|------|--------|
| 1991 | $154,829 |
| 1992 | 147,095 |
| 1993 | [1]159,121 |
| 1994 | [1]207,057 |
| 1995 | 226,869 |

[1] As previously described, it appears that for 1993 and 1994 respondent has overstated the amount of Dr. Beck's Schedule C income, thus resulting in an overstatement of the amounts of community property income for 1993 and 1994. We expect these errors to be corrected in the Rule 155 computation.

Respondent disallowed entirely the Schedule F farm losses that Dr. Beck claimed for 1993, 1994, and 1995, on the ground that Dr. Beck had not established that each claimed loss "constitutes an ordinary and necessary business expense, was expended, or was expended for the designated purpose." Respondent also disallowed the NOL carryforward deductions that Dr. Beck claimed for each year in issue, on the ground that Dr. Beck had "neither established * * * [his] entitlement under the Internal Revenue Code to [claim] a net operating loss nor substantiated the amount of any loss."

OPINION

Dr. Beck's Schedule C Deductions

For each year in issue, respondent disallowed a portion of Dr. Beck's claimed Schedule C expenses as described above.

Deductions are strictly a matter of legislative grace; petitioners bear the burden of proving that they are entitled to any deductions claimed.  <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).

Section 162(a) allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  Taxpayers must maintain records sufficient to establish the amount of their income and deductions.  Sec. 6001; sec. 1.6001-1(a), (e), Income Tax Regs.

Dr. Beck has offered no credible evidence to establish that he is entitled to deduct claimed Schedule C expenses greater than the amounts that respondent has determined to be allowable.[7] Consequently, we sustain respondent's determinations disallowing the claimed deductions.

---

[7] Dr. Beck claimed that his accounting records were stored in a "black box" at his office and that this box was mistakenly removed and disposed of by office cleaning people in February 1995.  Dr. Beck's contention is not credible in light of his deemed stipulations of fact.  The deemed stipulations indicate that according to the office cleaning people involved in the incident and the police officer who filed a report of the incident, the dimensions of the discarded box were approximately 9 by 12 by 4 inches.  The deemed stipulations also indicate that Dr. Beck's 1995 business and accounting records took up several five-drawer filing cabinets.  In any event, Dr. Beck has not attempted to substantiate his claimed deductions by reconstructing any expenditures through other credible evidence. Cf. <u>Watson v. Commissioner</u>, T.C. Memo. 1988-29.

Dr. Beck's Schedule F Deductions

In taxable years 1993, 1994, and 1995, Dr. Beck claimed Schedule F losses relating to an alleged horse operation. Respondent disallowed these losses in their entirety.

Dr. Beck presented no evidence to demonstrate the existence of any horse activity. He failed to present any records relating to the alleged horse activity or to otherwise substantiate or even explain the losses asserted on his returns.[8] Moreover, Dr. Beck did not establish that the alleged horse activity was conducted with the primary purpose of making a profit.

Dr. Beck has failed to establish that he is entitled to deduct the claimed Schedule F losses. Consequently, we sustain respondent's determinations disallowing the claimed Schedule F losses.

Net Operating Loss Carryovers

Dr. Beck claimed, and respondent disallowed, substantial net operating loss carryover deductions for each year in issue.

In the case of net operating loss deductions, as with other deductions, Dr. Beck bears the burden of proving that he is entitled to the claimed deductions. See Rule 142(a); United States v. Olympic Radio & Television, 349 U.S. 232, 235 (1955);

---

[8] In particular, with respect to the losses of $30,000 and $25,000, claimed in 1993 and 1994, respectively for "ONE DEAD HORSE", Dr. Beck established neither the existence nor demise of any horse.

Jones v. Commissioner, 25 T.C. 1100, 1104 (1956), revd. and remanded on other grounds 259 F.2d 300 (5th Cir. 1958); Leitgen v. Commissioner, T.C. Memo. 1981-525, affd. per curiam without published opinion 691 F.2d 504 (8th Cir. 1982).

Dr. Beck presented no evidence regarding any of his claimed NOL carryover deductions. Accordingly, Dr. Beck has failed to establish that he is entitled to the claimed NOL carryover deductions. We sustain respondent's determination disallowing these deductions.

Community Property Under Texas State Law

Texas is a community property State. See Tex. Const. art. 16, sec. 15; Tex. Fam. Code Ann. sec. 5.01 (Vernon 1993). Under Texas law, community property consists of all property acquired by either spouse during marriage, except for property acquired by gift, devise, or descent, or (with certain exceptions) in recovery for personal injuries sustained by a spouse in marriage. Tex. Fam. Code Ann. sec. 5.01. Property possessed by either spouse during or at dissolution of the marriage is presumed to be community property--a presumption rebuttable with clear and convincing evidence. Id. at sec. 5.02. A spouse's personal earnings are community property. Winger v. Pianka, 831 S.W.2d 853, 857 (Tex. App. 1992).

Because each spouse is owner of one-half of all community property, each spouse is liable for Federal income taxes on such

share.  United States v. Mitchell, 403 U.S. 190 (1971); Hopkins v. Bacon, 282 U.S. 122, 126-127 (1930); Bowling v. United States, 510 F.2d 112, 113 (5th Cir. 1975); Johnson v. Commissioner, 72 T.C. 340, 343 (1979).

Petitioners were married to each other throughout the years in issue.  Respondent determined that Dr. Beck's Schedule C and Schedule E net profits were community income during the years in issue and that each petitioner is liable for Federal income tax on one-half of this community income.  Neither Dr. Beck nor Mrs. Beck presented any evidence to contest respondent's determination.[9]

We sustain respondent's determination on this issue.

Relief From Liability Pursuant To Section 66(c)

In her petition, Mrs. Beck contends that she "is legally an 'innocent spouse.'"  Because Mrs. Beck and Dr. Beck did not file a joint return for any year in issue, the provisions of section 6015 for relief from joint and several liability on joint returns are inapplicable.[10]  Consequently, we construe Mrs. Beck's prayer

_____

[9] The deemed admissions and deemed stipulations state that Dr. Beck's income reported on Schedule C and Schedule E was community income during the years in issue.

[10] Mrs. Beck filed her petition on Aug. 28, 1998.  Effective July 22, 1998, former sec. 6013(e) was repealed and simultaneously replaced by sec. 6015 as part of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3201(a), 112 Stat. 734.  Sec. 6015 provides several avenues of relief from joint and several liability, all
(continued...)

for relief as arising under section 66(c), which provides relief from income tax liability with respect to unreported community income in certain circumstances.  Section 66(c) provides:

> SEC. 66(c).  Spouse Relieved of Liability in Certain Other Cases.--Under regulations prescribed by the Secretary, if--
>
> (1) an individual does not file a joint return for any taxable year,
>
> (2) such individual does not include in gross income for such taxable year an item of community income properly includible therein which, in accordance with the rules contained in section 879(a), would be treated as the income of the other spouse,
>
> (3) the individual establishes that he or she did not know of, and had no reason to know of, such item of community income, and
>
> (4) taking into account all facts and circumstances, it is inequitable to include such item of community income in such individual's gross income,
>
> then, for purposes of this title, such item of community income shall be included in the gross income of the other spouse (and not in the gross income of the individual).  Under procedures prescribed by the Secretary, if, taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either) attributable to any item for which relief is not available under the preceding sentence, the Secretary may relieve such individual of such liability.

---

[10](...continued)
conditioned on the electing individual's having made a joint return for the year in question.  See sec. 6015(a), (b)(1)(A), and (c)(1); Rev. Proc. 2000-15, 2000-5 I.R.B. 447 (Jan. 31, 2000).

Respondent does not dispute that Mrs. Beck meets the requirements of section 66(c)(1) and (2). Respondent contends, however, that she fails to meet the requirements of section 66(c)(3) and (4). For the reasons discussed below, we agree with respondent.

Mrs. Beck has failed to establish that she did not know of the subject items of community income, within the meaning of section 66(c)(3). Whether a taxpayer has knowledge of an item of community income is determined by reference to knowledge of a particular income-producing activity, rather than of the exact amount of community income. See McGee v. Commissioner, 979 F.2d 66, 70 (5th Cir. 1992) (and cases cited therein), affg. T.C. Memo. 1991-510; Roberts v. Commissioner, 860 F.2d 1235, 1239-1240 (5th Cir. 1988), affg. T.C. Memo. 1987-391. Here, Mrs. Beck clearly was aware that Dr. Beck's dental practice was an income-producing activity. Mrs. Beck occasionally worked in Dr. Beck's office, often called the office to determine how much money Dr. Beck earned on a given day, and during the last 2 years in issue made substantial deposits of income from the dental practice into her separate bank account and into petitioners' joint bank account. After Dr. Beck's dental license was revoked, she was actively involved in seeking to have the board dissolved, thus demonstrating engagement in his business affairs.

Petitioners have presented no evidence to establish that Mrs. Beck was unaware of the Schedule E community income.

Mrs. Beck has also failed to establish that it would be "inequitable" within the meaning of section 66(c)(4) to include her community share of Dr. Beck's earnings in her income. The legislative history of section 66(c)(4) indicates that an important factor to consider in this regard is "whether the spouse [who is seeking relief under section 66(c)] benefitted from the untaxed income". H. Rept. 98-432 (Part 2), at 1503 (1984). As previously discussed, in 1994 and 1995, Mrs. Beck made significant deposits of dental practice income into her separate bank account and petitioners' joint bank accounts.[11] In 1995, Mrs. Beck used dental practice income in purchasing the more than 100 acres of the Blanco property. Mrs. Beck has not shown that she did not benefit from the community property income.

The last sentence of section 66(c) (the section 66(c) equitable relief provision) provides for relief from liability if "it is inequitable to hold the individual liable for any unpaid

---

[11] The record does not reveal whether Mrs. Beck made similar deposits in other years in issue. The record contains no evidence to indicate that she did not benefit from the dental practice income or from the Schedule E income. We cannot assume that the missing evidence would be favorable to Mrs. Beck. Indeed, the normal inference is that the missing evidence would be unfavorable. See Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968).

tax or any deficiency * * * attributable to any item for which relief is not available" under section 66(c)(1) through (4). The section 66(c) equitable relief provision was enacted on July 22, 1998, and applies to any liability for tax arising after such date or arising on or before such date and remaining unpaid as of such date. See Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, secs. 3201(b), 3202(g), 112 Stat. 734, 740. As Mrs. Beck's liability for tax arose prior to July 22, 1998, and remains unpaid, the section 66(c) equitable relief provision is effective with respect to the instant case.

Respondent contends that denial of relief under the section 66(c) equitable relief provision is not subject to judicial review. We disagree. The section 66(c) equitable relief provision was enacted in the same section of the same legislation that created a similar equitable relief provision under section 6015(f).[12] See RRA 1998 sec. 3201(b), 112 Stat. 734. We have previously held that in a deficiency proceeding we have authority to review respondent's denial of equitable relief under section 6015(f) as part of our traditional authority in deficiency proceedings to render an opinion regarding affirmative defenses raised by the taxpayer. See Butler v. Commissioner, 114 T.C.

_____

[12] Sec. 6015(f) provides that if, taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency, and relief is unavailable under sec. 6015(b) or (c), the Secretary may relieve such individual of the liability.

276, 287-292 (2000); see also <u>Fernandez v. Commissioner</u>, 114 T.C. 324, 328-332 (2000) (Tax Court has authority in "stand alone" petition filed pursuant to section 6015(e)(1)(A) to review denial of relief under section 6015(f)).  For the same reasons discussed in <u>Butler v. Commissioner</u>, <u>supra</u>, we conclude that in this deficiency proceeding we have authority to review respondent's denial of equitable relief under the last sentence of section 66(c).

Consistent with our enunciated standard of review for respondent's denial of equitable relief under section 6015(f), see <u>Fernandez v. Commissioner</u>, <u>supra</u> at 331; <u>Butler v. Commissioner</u>, <u>supra</u> at 291-293, we review the Commissioner's denial of equitable relief under section 66(c) for abuse of discretion.

Mrs. Beck has not established that respondent abused his discretion in refusing her request for equitable relief.  As previously discussed, the record indicates that Mrs. Beck was involved in Dr. Beck's dental practice, was aware of the dental practice income, and benefited substantially therefrom.  The record is devoid of evidence that she was unaware of the Schedule E income.  Moreover, Mrs. Beck has failed to establish that she would suffer economic hardship if the relief were not granted. Finally, by persistently failing to comply with the Rules and Orders of this Court and by failing to cooperate with respondent

in preparing this case for trial, Mrs. Beck has demonstrated a lack of good faith that we believe is indicative of a lack of respect for the Federal income tax laws and the processes of this Court.

In sum, Mrs. Beck has not established that respondent would have abused his discretion in denying any request for relief under section 66(c).

Additions to Tax for Failure To File Timely Returns

Section 6651(a)(1) imposes an addition to tax for failure to file a timely return unless the taxpayer establishes that the failure "is due to reasonable cause and not due to willful neglect". Respondent contends that Dr. Beck is liable for section 6651(a)(1) additions to tax for failure to file timely returns for 1991, 1992, 1993, and 1994, and that Mrs. Beck is liable for the section 6651(a)(1) addition to tax for each year in issue.

It is undisputed that Dr. Beck did not timely file Federal income tax returns for taxable years 1991, 1992, 1993, and 1994. Dr. Beck has not established that he had reasonable cause for his failure to file timely returns. Accordingly, Dr. Beck is liable for the section 6651(a)(1) addition to tax for taxable years 1991, 1992, 1993, and 1994.

Mrs. Beck failed to file a Federal income tax return for any year in issue. In her petition, Mrs. Beck contends that she "is

legally impaired (as a result of mental illness, traumatic epilepsy, and brain damage) from comprehending or understanding the nature and requirements of the Internal Revenue Code."

A taxpayer's mental incapacity may constitute "reasonable cause" for failure to file returns. Bloch v. Commissioner, T.C. Memo. 1992-1. Judging by Mrs. Beck's demeanor at trial and her testimony, which was lucid and coherent, displaying at most naivety and poor judgment rather than mental incompetence, and in the absence of any medical evidence to the contrary,[13] we are unconvinced that Mrs. Beck was so mentally impaired that she could not appreciate her legal duty to file returns and pay taxes, particularly during the years in issue, when she was actively engaged in the conduct of Dr. Beck's dental practice.

Mrs. Beck has not established that she had reasonable cause for her failure to file timely returns. Accordingly, Mrs. Beck is liable for the section 6651(a)(1) addition to tax for each year in issue.

---

[13] At trial, the Court admitted into evidence, over respondent's objections, a letter that Dr. Beck alleged was sent to respondent's auditing agent, which Dr. Beck alleged to contain medical reports regarding Mrs. Beck's "emotional instability and sensitivity." After trial, it was discovered that Dr. Beck had failed to relinquish to the Court this exhibit and other exhibits that he had proffered and that had been marked for identification. On Nov. 1, 1999, and Nov. 3, 1999, the Court's trial clerk contacted Dr. Beck and requested that he return the exhibits to complete the record in this case. After receiving no response, on Feb. 9, 2000, the Court ordered the missing exhibits stricken from the record of these cases.

## Dr. Beck's Liability for Accuracy-Related Penalties

Respondent contends that for each year in issue Dr. Beck is liable for the section 6662(a) accuracy-related penalty. Section 6662(a) imposes a 20-percent penalty on any portion of an underpayment that is attributable to, among other things, negligence or disregard of the rules or regulations. Sec. 6662(b)(1). Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the same circumstances. Neely v. Commissioner, 85 T.C. 934 (1985). No penalty shall be imposed under section 6662(a) with respect to any portion of an underpayment if it is shown that there was reasonable cause and that the taxpayer acted in good faith. Sec. 6664(c).

Dr. Beck failed to produce evidence to substantiate the deductions he claimed on his Schedules C and F. His failure to maintain and to produce records of his business activities shows not only negligence but intentional disregard of rules and regulations requiring a taxpayer to keep permanent records sufficient to establish his gross income and deductions. See Crocker v. Commissioner, 92 T.C. 899, 917 (1989); Schroeder v. Commissioner, 40 T.C. 30, 34 (1963).

Dr. Beck has come forward with no evidence to establish that he acted in good faith. As previously discussed, Dr. Beck's claims that office cleaning people accidentally discarded all his business records are not credible. Dr. Beck is liable for the

section 6662(a) accuracy-related penalty with regard to his entire underpayment for each year in issue.

Mrs. Beck's Liability for Section 6654(a) Additions to Tax

Respondent determined that for each year in issue, Mrs. Beck is liable for the section 6654(a) addition to tax for underpayment of estimated tax by an individual. During the years in issue, Mrs. Beck filed no returns and paid no estimated taxes.

Mrs. Beck has not shown that any of the exceptions contained in section 6654(e) apply. Therefore, we hold that she is liable for the section 6654(a) addition to tax for each year in issue.

To reflect the foregoing and concessions by respondent,

Decisions will be entered

under Rule 155.